HELLMANN, Secretary of State *v.* COLLIER

[No. 36, September Term, 1958 (Adv.).]

*Decided, per curiam, April 24, 1958.*

*Opinion filed May 21, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Charles B. Reeves, Jr., Assistant Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for the appellant.

*James B. McCloskey,* with whom was *David J. Preller* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

We have previously filed a *per curiam* order which affirmed

the ruling of Judge Tucker in this case in the Baltimore City Court. We shall now state our reasons for doing so.

The petitioner below, Louis W. Collier, desired to seek the nomination of the Republican Party for the office of United States Representative for the Fourth Congressional District of Maryland. He filed, in proper time, his certificate of candidacy with the appellant, the Secretary of State of Maryland, who refused to certify the candidacy to the Board of Supervisors of Elections for Baltimore City on the ground that the petitioner was a resident of the Second Congressional District of Maryland, it being conceded that Mr. Collier possessed all of the necessary qualifications to seek the said nomination, other than residence in the Fourth Congressional District, and Mr. Collier admits that he is not a resident of that District.

Chapter 739, section 1, of the Acts of the General Assembly of Maryland of 1957 (Article 33, sec. 158 (c) of the Code (1957)) reads as follows: "(c) *Residence of Candidate.* Every candidate for election to the House of Representatives shall be a resident of the congressional district in which he seeks election." It was because of this statute that the appellant refused to certify the candidacy of the appellee, which refusal resulted in this *mandamus* proceeding praying that the appellant be compelled to do so. It is obvious that if the above quoted section 158 (c) be a valid and constitutional enactment of law by the Legislature of this State, as contended by the appellant, the appellant is correct in refusing to certify the appellee's candidacy, and it is equally plain that if said enactment be invalid and unconstitutional, the appellee is entitled to have his candidacy properly certified; therefore our inquiry is to determine the constitutionality of said statute.

We have repeatedly held that the general rule of the construction of a statute is that every presumption favors its validity and reasonable doubt is enough to sustain. This Court is very reluctant to defeat the will of the Legislature by declaring its legislation void, if, by any construction, it can possibly be maintained. *Leonardo v. County Commissioners,*

214 Md. 287, 299; *Pressman v. State Tax Commission,* 204 Md. 78, 94.

Pertinent sections of the Federal Constitution read, in part, as follows:

> Article VI, Cl. 2: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; * * *."

> Article I, Sec. 2, Cl. 2: "No Person shall be a Representative who shall not have attained to the Age of twenty-five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen."

> Article I, Sec. 4, Cl. 1: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

> Article I, Sec. 5, Cl. 1: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members * * *."

A careful reading of Article I, section 2, above, will disclose that there are two aspects that must be considered in determining the constitutionality of section 158 (c): (a) does Article I, section 2, because of its wording "[n]o Person shall be a Representative who shall not have to attained the Age of twenty-five Years" *et cetera* merely prescribe the minimal qualifications for that office to which the states may superadd others, or does it actually state all of the qualifications that a state may require of a Representative; and (b) is the requirement that a candidate reside in a specified district an additional qualification to that portion of said section which provides that a Representative shall "be an Inhabitant of that State in which he shall be chosen"?

(a)

This question seems to be fully answered in the case of

*Shub v. Simpson,* 196 Md. 177, 198. This Court, in that case, held that a state statute, which required of a candidate for the office of Representative an oath under the Subversive Activities Act (Art. 85A, sec. 15, Code (1957)), was ineffective as applied to a candidate for that office, on the ground that a state cannot, in any manner, impose additional qualifications to those named in the Federal Constitution upon a candidate for Representative. See also 1 *Story, Commentaries on the Constitution of the United States,* (4th ed.), sec. 625; 1 *Willoughby, Constitutional Law of the United States,* (2d ed.), sec. 337. Cf. *Thomas v. Owens,* 4 Md. 189, 223.

Because, under Article I, sec. 5, it would ultimately have controlling effect, it is interesting to observe how Congress has treated the matter. In 1856, Messrs. Marshall and Trumbull, state judges, were elected to the House of Representatives by their respective districts in the State of Illinois. However, the Governor refused to issue them credentials, because the Illinois constitution prohibited state judges from being elected to any office in the federal government. Having received a majority of the votes in their respective districts, they requested the House of Representatives to seat them and invalidate the Illinois constitutional restriction. The House Committee report ably and fully dealt with the question we are now considering, agreed with the arguments of Marshall and Trumbull, and pertinently said:

> "The qualifications of a Representative, under the Constitution, are that he shall have attained the age of 25 years, shall have been seven years a citizen of the United States, and, when elected, an inhabitant of the State in which he shall be chosen. It is a fair presumption that, when the Constitution prescribes these qualifications as necessary to a Representative in Congress, it was meant to exclude all others. And to your committee it is equally clear that a State of the Union has not the power to superadd qualifications to those prescribed by the Constitution for Representatives, to take away from 'the

people of the several States' the right given them by the Constitution to choose, 'every second year,' as their Representative in Congress, any person who has the required age, citizenship, and residence."

The House sustained the report of the committee by a vote of 125 to 5, but only Marshall was seated, since the undaunted Mr. Trumbull had, in the meantime, been elected to the Senate. The Senate debated the propriety of seating Mr. Trumbull, and, by a vote of 35 to 8, it approved his qualifications and refused to give effect to the Illinois restrictions. 1 *Hinds' Precedents of the House of Representatives,* secs. 415, 416; 1 *Bartlett, Cases of Contested Elections,* pp. 167, 168, 169. In 1884, the House reaffirmed the position it had taken in the case of Messrs. Marshall and Trumbull. See *Wood v. Peters,* 1 *Hinds' op. cit.,* sec. 417.

From the above, it would appear that no state has the power to fix the qualifications of Representatives in Congress (see also *McCrary, American Law of Elections,* (4th ed.), sec. 326); so our inquiry narrows to answering (b).

(b)

In so far as reported decisions are concerned, this question seems to be novel; but it has been considered by learned and renowned constitutional scholars and text-writers, and by Congress.

Pursuant to the authority contained in Article I, section 4, above quoted, Congress in 1842 (5 Stat. 491, Ch. 47) provided for the election of Representatives by districts. This authority was conferred on Congress in order "to secure fair representation by the States in the popular House and left to that House determination whether States have fulfilled their responsibility." *Colegrove v. Green,* 328 U. S. 549, 554.

At the time of the passage of the Act of 1842, seventeen of the States were already electing their Representatives by districts, and the remaining nine States were electing theirs at large. *Library of Congress, Memorandum* JK 1341: *Apportionment of Membership in the House of Representatives,* page 1. Since the Act of 1842, Congress has changed, on several occasions, the provisions relating to congressional

districts.  *Ibid.,* pp. 1-15.  The present apportionment Act was enacted in 1929 and amended in 1941, and is now codified as 2 *U. S. C. A.,* 2a and 2b.  This Act establishes an automatic procedure for the reapportionment of the membership in the House of Representatives to reflect changes in the population of the States; redistricting is permitted but not mandatory under its provisions.

In 1790, the Legislature of this State divided Maryland into six Congressional Districts, Ch. XVI, Acts of 1790, and by section 8 of said Act it was provided that the candidates for the House should reside in their respective districts for at least twelve months before their elections.[1]  By Ch. LXX of the Acts of 1802, Maryland was divided into eight districts. Baltimore City and Baltimore County comprised the fifth district, which was entitled to two Representatives, "one of which shall be a resident of Baltimore county and the other a resident of Baltimore city."   In 1807 Joshua Barney contested the seat of William McCreery on the ground that McCreery, though he claimed to be, was not a resident of Baltimore City.  A Mr. Moore, indisputably a resident of Baltimore County had received the highest number of votes; McCreery, whose residence in Baltimore City was questioned, the next highest number of votes; and Barney, a conceded resident of Baltimore City, was the next in line.   The House Committee brought out a report that stated the Maryland law was unconstitutional.  This report was the subject of an exhaustive debate that lasted a full week.  It was not adopted, but McCreery was seated by a simple resolution stating he was entitled to his seat in the House.  1 *Hinds' op. cit.,* sec. 414; *Clarke and Hall, Digest of Contested Election Cases,* pp. 167-221.  This case does not furnish much assistance in determining the precise point under consideration, because the result could have meant that the House concluded that McCreery was a resident of Baltimore City rather than that

---

1. This Act was repealed, apparently sometime before 1888, and no similar provision was made until the Act of 1957. There seems to be only one other State that has a statute of like import. Rev. St. of Maine, Ch. 5, sec. 69, par. 2 (1954).

the Maryland law was unconstitutional, but in 1856 and thereafter, in the cases cited under (a), both Houses of Congress decided that the States could not impose additional restrictions on the qualifications of their members.

Among the distinguished and eminent scholars and text-writers on constitutional law, there seems to be universal concurrence that the states have no authority to require a residence by a candidate for Representative in any particular district, so long as he be an inhabitant of the state. Perhaps, Professor Story sums up the matter as succinctly and clearly as could be desired:

> "In regard to the power of a State to prescribe the qualification of inhabitancy or residence in a district, as an additional qualification, there is this forcible reason for denying it, that it is undertaking to act upon the very qualification prescribed by the Constitution, as to inhabitancy in the State, and abridging its operation. It is precisely the same exercise of power on the part of the States, as if they should prescribe that a representative should be forty years of age, and a citizen for ten years. In each case, the very qualification fixed by the Constitution is completely evaded and indirectly abolished."

1 *Story, op. cit.,* sec. 629.
It is followed by this footnote apparently by Thomas M. Cooley:

> "It is now universally conceded that a State cannot prescribe qualifications for members of Congress, or establish disabilities. The whole subject is beyond the sphere of its powers. Congress has always, with entire propriety, disregarded State regulations on the subject."

Professor Willoughby agrees, 2 *Willoughby, Constitutional Law of the United States,* sec. 349, and compare sec. 337 of the first volume, *op. cit., supra,* as well as *Chancellor Kent, Commentaries on American Law,* (14th ed.), Vol. I, *228 note (f), and *Gosnell, Lancaster & Rankin, Fundamentals of American National Government,* p. 199.

In 3 American L. Rev., *The Legal Qualifications of Representatives,* pp. 410, *et seq.,* the author deals with certain early statutes in Massachusetts, Vermont, Connecticut, Virginia and Georgia requiring residence in a Congressional District as a prerequisite to candidacy and criticizes them as attempted encroachments on the federal prerogatives by the States.

We hold that section 158 (c) of Article 33 of the Code (1957) contravenes Article I, Sec. 2, Cl. 2 of the Constitution of the United States, and is, therefore, unconstitutional and void.

The appellant, in his brief, mildly mentions the possibility that the above question should be treated as political and not judicial, but we are unable to discover from the record that this question was presented to the trial judge; so we shall not consider it. Maryland Rule 885.

The above are the reasons for our former order affirming Judge Tucker's ruling in the trial court.